UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
—————————————————————

SIGURD A. SORENSON,

                    Plaintiff,              10 Cv. 4596 (JGK)

          - against -                       OPINION & ORDER

STANLEY WOLFSON,

                    Defendant.
—————————————————————

JOHN G. KOELTL, District Judge:

      This case is the latest chapter in a lengthy and
acrimonious dispute about one apartment in a condominium
development.

      In 2005, plaintiff Sigurd Sorenson executed purchase
agreements with Bridge Capital Corporation ("Bridge Capital") to
acquire three unfinished units in a condominium building.
Defendant Stanley Wolfson is the sole owner of Bridge Capital.
Sorenson provided Bridge Capital with the floorplan and the
roofplan for one apartment unit.  Todd Ernst, an architect,
created those plans.

      The deal fell through, and Sorenson then sued Wolfson—among
others—in New York State court.  The New York State courts
dismissed all but one of Sorenson's claims.  Sorenson now claims
that Wolfson defrauded the Appellate Division of the New York

1

State Supreme Court and that was the reason for his lack of success in the state court litigation.

Sorenson also alleges that Wolfson distributed a floorplan and a roofplan for the apartment that Sorenson sought to buy. He contends that the plans were provided to an advertising company, to potential buyers, and to the New York State Attorney General. Sorenson insists that he was the owner and the author of those plans and that Wolfson therefore infringed his copyright to those plans.

This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1338(a). The Court conducted a non-jury trial from November 10, 2014, through November 17, 2014. Sorenson, an attorney, proceeded pro se at trial. Having considered all of the evidence and assessed the credibility of the witnesses, the Court makes the following findings of fact and reaches the following conclusions of law pursuant to Federal Rule of Civil Procedure 52. For the following reasons, the plaintiff's claims **are dismissed with prejudice.**

## FINDINGS OF FACT

1. Defendant Stanley Wolfson is a real estate developer and the sole owner, principal, and shareholder of Bridge Capital. Trial Tr. at 313. Bridge Capital was the original sponsor of a residential condominium development located at 257 West 117th

2

Street in New York, New York (the "Building").   Trial Tr. 313–14.

2. In 2002, Bridge Capital hired Todd Ernst, R.A., to design the floorplans for the residential units in the Building.  As part of this project, Ernst designed a floorplan for Unit 7A.[1] Def.'s Ex. 42.3A.  The floorplan for Unit 7A included two bedrooms and the following notation: "© 2002 Todd A. Ernst." Id.

3. On March 5, 2004, the New York State Attorney General accepted Bridge Capital's Offering Plan for Condominium Ownership of the Building.  Def.'s Ex. 89, at 1.  The Offering Plan included a pictorial representation of the two-bedroom Unit 7A floorplan.  Id. at 157.

4. In or around July 2004, Sorenson met Wolfson, and Sorenson expressed interest in purchasing apartment units in the Building.  Trial Tr. 95–96.  At the time of the conversation, the Building had been gutted, and its interiors not yet constructed.  Id.

5. Thereafter, Sorenson contacted Marcia Esquenazi, an architect, about creating floorplans for the units that he wished to purchase.  Sorenson told Esquenazi that he would like

---

[1]    Unit 7A was relabeled Unit 7B in 2006.  Joint Trial Stip. ¶ 1.  The Court will refer to this apartment as "Unit 7A" throughout the opinion.

to have four bedrooms in one of the units.  Esquenazi informed Sorenson that if he purchased a unit on the top floor of the Building, he could install skylights to comply with New York air and light regulations.  Trial Tr. 444–45; Def.'s Ex. 113. Sorenson did not hire Esquenazi.  Trial Tr. 453–55.

6. In the summer of 2004, Sorenson instead hired Ernst to create blueprints for Unit 7A and two other units in the Building.  Trial Tr. 67–68.  From 2004 to 2007, Sorenson paid Ernst approximately $50,000 to create those plans.  Trial Tr. 68.

7. Sorenson testified that in "late 2004 or early 2005" he provided Ernst with "sketches" and "detailed instructions" for the design of Unit 7A.  Trial Tr. 56, 65.  Sorenson also testified that he provided these sketches and instructions in their "first meeting" in August 2004.  Trial Tr. 59, 82, 97.

8. At trial, Sorenson did not submit any of these sketches or instructions, and he never asked Ernst to produce a copy of them.  Trial Tr. 59–60.

9. Sorenson further testified: "I physically went to the site with Mr. Ernst and his employees to mark where the walls should be and should end, where the skylight should be, where the electrical pitch pockets and the plumbing pitch pockets should be, where the stairs should be, where the bulkhead should be."  Trial Tr. 38.

4

10. Ernst sent Sorenson a proposed contract dated September 3, 2004, for creating a design for Unit 7A.  Def.'s Ex. 110. The contract identified the scope of services that Ernst would perform, the project's estimated cost, and a fee schedule.  Id.

11. On September 8, 2004, Sorenson sent the contract back to Ernst with suggested changes and questions.  Id.

12. The contract included the following provision: "All drawings and specifications prepared by our office shall remain our exclusive property at all times for the purpose of reproduction.  Our drawings and specifications may not be used on any other project or for the completion of this project by any other firm without our written permission." Id.  Sorenson did not comment on, or suggest any changes to, this provision.

13. At trial, neither party produced a signed version of this contract.  However, Sorenson testified that he paid invoices sent by Ernst, Trial Tr. 146, and that "it must have been in my mind that the terms in [the contract] would be the basis of our agreement."  Id.

14. On September 21, 2004, Gadi Lubetzky, an Ernst employee, sent an e-mail to Sorenson with the subject "7A Floor Plan." Attached to the e-mail were a floorplan and a roofplan for Unit 7A.  Def.'s Ex. 42.12.  The plans listed "Ernst Architect, PLLC" as the architect and included the following notation: "© 2004 Todd A. Ernst, R.A." Id.

15. Ernst and his employees created floorplans and roofplans through AutoCAD, which is a software application for designing and drafting architectural blueprints.  Trial Tr. 39.  Esquenazi testified that when creating floorplans with the AutoCAD software, she begins with a sketch of the project.  Then, she inputs code and program requirements.  Trial Tr. 442–43.  Both inputs, according to Esquenazi, require architectural and AutoCAD training.  Trial Tr. 443–44.

16. Sorenson testified that he has no knowledge of how to design or draft plans with the AutoCAD software.  Trial Tr. 65, 71, 141, 173.  Sorenson also testified that he lacks the expertise and knowledge to create plans that would be approved by the New York City Department of Buildings.  Trial Tr. 66.

17. The 2002 Unit 7A plan created by Ernst differed most noticeably from the 2004 plans Ernst made for Sorenson in that the updated plans included two additional bedrooms; placed the three non-master bedrooms on the "left" side of the plans; placed the master bedroom and master bathroom on the "lower right" side of the plans; changed the location of the second bathroom to where the master bathroom previously was located; added stairs for roof access; and added an additional window to the "left" side of the plans.  The updated plans also included diagrams for potential furniture placement and a design for the roof.  Compare Def.'s Ex. 42.3A, with Def.'s Ex. 42.12.

6

18. On September 21, 2004, Sorenson e-mailed Lubetzky and asked her to indicate where on the plans the skylights would be located.  Def.'s Ex. 42.13.  Lubetzky responded by providing updated floorplans and roofplans, which indicated where the skylights would be placed.  Def.'s Ex. 42.14.  The plans included Ernst's copyright notice and title block.

19. On September 23, 2004, Lubetzky sent an e-mail to Sorenson with the electrical and lighting plans for Unit 7A attached.  Those plans also included Ernst's copyright notice and title block.  Def.'s Ex. 42.16.  On November 8, 2004, Ernst sent Sorenson another e-mail, which included the Unit 7A floorplans and roofplans.  Those plans also bore Ernst's copyright notice and title block.  Def.'s Ex. 42.29.

20. On January 28, 2005, Sorenson and Bridge Capital signed an "Amended Purchase Agreement" for Unit 7A.[2]  The agreement provided that the purchase price—a $99,900 deposit and an $899,100 balance—covered the "Unit and Roof Rights" of Unit 7A. Def.'s Ex. 17, at ¶ 3.  The agreement also provided that "construction of the Building . . . shall be substantially in

---

[2]    Neither party introduced any previous purchase agreement into evidence.  Moreover, Bridge Capital and Sorenson apparently entered into purchase agreements for three units in January 2005, but only submitted the Amended Purchase Agreement for Unit 7A.  Trial Tr. 34.

accordance with the Plan and the Plans and specifications." Id. at ¶ 17.1.

21. Paragraph 37(a) of the agreement provided that "[s]ignificant additional and different work shall be done in the build out of the Unit than is specified in the Plan. . . . Specifically, the Build Out . . . shall be performed and completed per approved architectural plans building specifications . . . prepared by Ernst Architect PLLC . . . on behalf of Purchaser.  Purchaser shall provide Sponsor with Purchaser's Specifications within 21 days after the signing of this Agreement." Id.

22. On February 4, 2005, Yossi Melamed, an Ernst employee, sent an e-mail to Scott Evans and Sorenson with revised Unit 7A plans attached.  Def.'s Ex. 42.37; Trial Tr. 498.

23. In April 2005—after Wolfson had refused to sell the three units to Sorenson—Sorenson filed a complaint in the New York State Supreme Court, New York County, against Bridge Capital and Wolfson.  Sorenson v. Bridge Capital Corp., No. 601289/2005 (N.Y. Sup. Ct. filed April 12, 2005).  The complaint alleged, among other things, that the defendants breached the Amended Purchase Agreement and committed fraud (the "contract action").  Def.'s Ex. 25.[3]  Sorenson filed an amended complaint

---

[3]    This complaint was not introduced into evidence, but the Court may take judicial notice of the document.  Staehr v.

in November 2005.  Def.'s Ex. 8.  Sorenson also filed a notice
of pendency on the Building.  Trial Tr. 253-54, 273.[4]

24. In 2005, Bridge Capital, Robert Friedman, and Bernard
Friedman formed 257/157 Realty LLC ("257 Realty").  Trial Tr.
314.  According to Wolfson, "[t]he entity was formed due to a
financial arrangement made between Bridge and the Friedmans, and
we needed a new entity that I would be an economic partner in,
and they would also be economic partners."  Id.  In June 2005,
Bridge Capital transferred ownership of the building to 257
Realty.  Trial Tr. 315.

25. In July 2005, Bridge Capital, Robert Friedman, and
Bernard Friedman executed an "Amended and Restated Operating
Agreement of 257/117 Realty LLC" (the "Operating Agreement").
Def.'s Ex. 26.  The Operating Agreement recognized that Robert
Friedman and Bernard Friedman had each assumed a 24.95% interest
in 257 Realty and Bridge Capital had a 50.1% interest in 257
Realty.

26. Paragraph 3.1 of the Operating Agreement also provided
that the operation and control of 257 Realty "shall be vested

---

Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir.
2008).

[4]    In June 2005, Justice Ramos canceled the notice of
pendency.  The Appellate Division, First Department reversed the
cancelation and reinstated the notice.  Sorenson v. Bridge
Capital Corp., 817 N.Y.S.2d 229, 230 (App. Div. 2006).

solely in the Managers.  The Managers of the Company shall be [Robert Friedman] and [Bernard Friedman]."  Id.  And paragraph 3.2 provided that "[a]ny decision regarding the construction, financing, budgeting, and marketing of the project shall be made by the unanimous concurrence of all Managers, without the requirement of consent by the Members, but except for Major Decisions, either Manager shall have the power to bind the company and any third party dealing with the company may rely on the authority of either Manager."  Id.  Robert Friedman testified that he did not need the consent of Wolfson to construct, finance, or market the units in the Building.  Trial Tr. 287; see also Trial Tr. 336–37.

27. In February 2006, Sorenson filed a second action (the "fraudulent conveyance action") against Wolfson, Bridge Capital, and 257 Realty in the New York State Supreme Court, New York County.  Sorenson v. 257/117 Realty, LLC, No. 600533/2006 (N.Y. Sup. Ct. filed Feb 16, 2006); Def.'s Ex. 29.  The complaint alleged that "Wolfson and/or Bridge caused 257 Realty to be formed," that "Bridge purportedly transferred all right, title, and interest in the Building to 257 Realty" for ten dollars, and that Bridge Capital made this transfer to render "Bridge judgment-proof" in Sorenson's contract action.  Def.'s Ex. 29, at ¶¶ 14, 39.

28. Throughout 2006 and 2007, the parties in the state court actions engaged in settlement discussions.  Trial Tr. 91-92, 262.  During those discussions, Sorenson repeatedly requested that the defendants build out Unit 7A according to plans that Sorenson had provided to Bridge Capital.  Def.'s Ex. 49; Trial Tr. 266-67.[5]  He also insisted that the defendants "amend [the] offering plan to make it consistent with" the provisions in the proposed settlement.  Def.'s Ex. 49; Trial Tr. 264.  The defendants agreed and built out Unit 7A "as a four-bedroom apartment with the expectation and hope that the settlement would be reached and we would have the apartment built."  Trial Tr. 239.  The defendants also updated the offering plan—at Sorenson's request—to include the four-bedroom floorplan and the roofplan for Unit 7A that Sorenson had provided.  Trial Tr. 266-67.

29. As part of the settlement negotiations, Sorenson also requested that the state-court defendants pay for a number of upgrades to Unit 7A.  See Def.'s Ex. 49.  The defendants believed that those requests "just made no—no sense whatsoever." Trial Tr. 268.

---

[5]    While evidence regarding settlement negotiations is ordinarily inadmissible, see Fed. R. Evid. 408, the parties stipulated "not to object to the authenticity or admissibility of the documents listed in the Parties' respective trial exhibits."  Joint Trial Stip. ¶ 3.

30. On May 15, 2006, Robert Friedman, Bernard Friedman, and Bridge Capital submitted a second amendment of the Building's offering plan to the New York State Attorney General.  That amendment included the 2002 floorplan and roofplan for Unit 7A. See Pl.'s Ex. 10-11; Trial Tr. 40-42, 427.  The second amendment also identified 257 Reality as the "Sponsor" of the offering plan, with Robert Friedman, Bernard Friedman, and Bridge Capital listed as "principals of the Sponsor."  Pl.'s Ex. 37; Trial Tr. 46.

31. Robert Friedman explained that Bridge Capital was listed as a sponsor because:

> there was an action pending for fraudulent conveyance of the building from Bridge Capital to 257/117 Realty.  And the title companies were all upset about that, because if Mr. Sorenson prevailed on those claims, then ownership of the building would revert back to Bridge Capital.  So that being the case, the title companies could not insure title to buyers of units in the building.  So what I worked out with the title companies was that Bridge Capital will sign the deed, in addition to 257/117 Realty signing the deed, and in effect Bridge Capital could claim any right, title and interest they had in the condo unit to the buyer.  In this way, it protected the title companies and the buyer, because if Mr. Sorenson was successful in his fraudulent conveyance action, then Bridge Capital, who would receive title back, would be signing the deed, or would have signed the deed, so the unit transfer would be authorized and the buyers would get good title regardless of whether Mr. Sorenson prevailed or not.

Trial Tr. 284-85.

32. Friedman further testified that the listing "was purely to satisfy a legal requirement.  It had nothing to do with the

12

business of operating the company or building it out or financing it or selling the units.  No, it had nothing to do with that."  Trial Tr. 286.

33. The Attorney General then requested that the second amendment disclose the Sorenson state court actions.  Pl.'s Ex. 37; Trial Tr. 431-33.

34. As a result, the second amendment also included multiple paragraphs explaining the pending Sorenson litigation and its effect on the ability to guarantee title in the sale of any unit in the Building.  Pl.'s Ex. 25.

35. The second amendment further explained that Bridge Capital (the "Old Sponsor") had conveyed its interest in the building to 257 Realty (the "New Sponsor"").  Id.  It provided that:

> [a]ll references to the Sponsor in the Plan and all amendments thereto, and any purchase agreement or any other document executed thereunder shall be deemed to mean to the Original Sponsor and the New Sponsor collectively.  In the event that Mr. Sorenson's claim to set aside the deed from the Original Sponsor to the New Sponsor is resolved in favor of the Original Sponsor, New Sponsor reserves the right to amend this Plan to remove the Original Sponsor from being a Sponsor hereunder.

Id.

36. The New York State Attorney General accepted the second amendment for filing on November 22, 2004.  Pl.'s Ex. 38.

37. Amendments three through eleven to the offering plan were also filed and accepted by the Attorney General.  See, e.g., Pl.'s Ex. 34; see also Trial Tr. 478-79.

38. Although Bridge Capital was listed as a sponsor in some of the offering plan amendments, Robert Friedman testified credibly that Bridge Capital and Wolfson had no role in the day-to-day operation of the Building.  Trial Tr. 287-88.  Robert Friedman also testified that he and Bernard Friedman created and filed the amendments to the offering plans, Trial Tr. 288, and Wolfson had no role in their preparation.  Trial Tr. 289-90.

39. Robert Friedman testified that all potential and actual buyers of apartments in the Building would have received copies of the amendments to the offering plan.  Trial Tr. 246.

40. Robert and Bernard Friedman engaged in litigation in the New York State Supreme Court, New York County against Wolfson and Bridge Capital over who was responsible for managing 257 Realty.  The litigation was eventually settled.  Despite allegations to the contrary during that litigation, Wolfson never made any "management decisions" for, nor was he ever a manager of, 257 Realty.  Trial Tr. 299.

41. In September 2007, Sorenson received the "final version" of the four-bedroom floorplan of Unit 7A from Yossi Melamed, an Ernst employee, and a copy of the floorplan and the roofplan from Ernst.  Trial Tr. 113-14; Def.'s Ex. 42.80-42.81.  Those

14

plans are dated February 10, 2005, but note multiple revisions made by Ernst in 2007.  Trial Tr. 82; Def.'s Ex 42.80-42.81. Indeed, Sorenson testified that Ernst made multiple "tweaks" to the plans in 2007.  Trial Tr. 82.

42. This set of plans includes greater detail than the initial 2004 plans, but the basic design remained the same. Compare Def.'s Ex. 42.80-42.81, with Def.'s Ex. 42.14.

43. As of September 2007, 257 Realty had spent $391,506 building Unit 7A according to Sorenson's specifications.  Def.'s Ex. 66.  The work completed included the framing, electrical, plumbing, skylight installation, and stairs.  Id.  The remaining work included installing the seam roof, hardwood floors, deck, hot tub, kitchen cabinets, and sliding doors.  Def.'s Ex. 67.

44. Sorenson did not dispute at trial that Unit 7A was "substantially completed" as a four-bedroom unit as of November 2007.  Michael Even, who replaced Ernst as the chief architect of the Building, testified credibly that Unit 7A was substantially completed by that time.  Trial Tr. 415.

45. On or around November 26, 2007, Sorenson found a pictorial depiction of the four-bedroom floorplan and roofplan for Unit 7A on Halstead Property's website.  Trial Tr. 42; Pl.'s Ex. 12.

46. Halstead Property was the sales agent for the Building. Trial Tr. 270; Pl.'s Ex. 24.  Robert Friedman made the decision

15

to market the Building through Halstead Property.  Trial Tr.
290.  Friedman generally was in "conversation with Halstead"
about whether Unit 7A was "going to be four bedrooms, whether
there is going to be a settlement, no settlement, whether it's
going to be two bedrooms, and what they did with that
information posting on the web site I really don't know."  Trial
Tr. 291.

47. By order dated January 3, 2008, Justice Ramos of the New
York State Supreme Court granted a motion for summary judgment
by Bridge Capital and Wolfson in the contract action and
dismissed Sorenson's complaint.  Def.'s Ex. 32.[6]

48. On January 25, 2008, in an apparent reaction to his
recent loss in the state court contract action, Sorenson sent a
cease and desist letter to Robert Friedman, Bernard Friedman,
Wolfson, Bridge Capital, and 257 Realty demanding that they
"cease and desist from selling [Unit 7A] in the Building, that
you remove the copy of my Plans from the Halstead website, that
you destroy all copies of the Plans immediately, and that you
desist from this or any other infringement."  Pl.'s Ex. 13.

49. Counsel for Robert Friedman, Bernard Friedman, Wolfson,
and 257 Realty responded by reminding Sorenson that he had
provided the plans for Unit 7A and that the apartment was built

---

[6]    This exhibit was not submitted into evidence, but it is
subject to judicial notice.

16

out to his specifications.  Nevertheless, counsel offered to change Unit 7A from a four-bedroom to a two-bedroom apartment, to destroy any plans that Sorenson had provided, and to request that Halstead Property remove the offending plans from its website.  Pl.'s Ex. 14.  By May 2008, Unit 7A had been converted into a two-bedroom apartment.  Trial Tr. 414-15.

50. On January 28, 2008, Sorenson filed an application for copyright registration with the Copyright Office.  Def.'s Ex. 43A.  The application was for the 2004/2005 Unit 7A floorplan and roofplan created by Ernst.  See Pl.'s Ex. 1.

51. However, there were serious omissions and alterations to the plans submitted to the Copyright Office compared to the plans that Sorenson had obtained from Ernst.  First, Sorenson deleted Ernst's title block and the copyright symbol on both the roofplan and the floorplan.  Compare Def.'s Ex. 42.80, with Pl.'s Ex. 1; Trial Tr. 115.  Second, Sorenson deleted a notation that identified revisions to the February 10, 2005 floorplan. Compare Def.'s Ex. 42.80, with Pl.'s Ex. 1; Trial Tr. 122. Third, Sorenson cut the title block and construction legend from the right side of the floorplan, and pasted them on the left side of the plan.  Compare Def.'s Ex. 42.80, with Pl.'s Ex. 1.

52. When asked why he deleted Ernst's title block, the copyright symbol, and the revisions notation, Sorenson testified incredibly as follows:

17

Oh, yeah, because this was not important to the
copyrightable elements in the plan. This notice was
completely superfluous, the violation blah, blah. So
what I --what I thought was it might be important for
the copyright office was to know where it was located.
And so I put that in. And to put the legend in here, so
that they could - because there are different types of
lines. So I thought that that would be important, too.
But you have to understand, your Honor, there was no --
I was not, I was just going -- there was no attempt to
pretend like this was not Todd Ernst's AutoCAD file that
I received from him, vis-a-vis the plaintiff. I gave
this to them. I knew that, I assumed that they would,
you know, immediately see, oh, yeah, this is what we got
from Sig, and this was Todd's plans that were done on
the AutoCAD. So, you know, I -- so what I chose to put
in here is what I thought the -- the copyright office
would be most interested in, vis-a-vis determining
whether the stuff in the interior of the plan was
copyrightable.

Trial Tr. 117–18.

   53. This explanation is specious. First, Sorenson's
assertion that "there was no attempt to pretend like this was
not Todd Ernst' AutoCAD file" has no basis in reality. Sorenson
deleted each and every reference to Ernst in the plans that he
submitted to the Copyright Office. Second, it is impossible to
understand how the Copyright Office "would, you know,
immediately see, oh, yeah, this is what we got from Sig, and
this was Todd's plans that were done on the AutoCAD." The
application for registration does not mention Ernst. See Def.'s
Ex. 43A. Third, Sorenson's testimony that he "zeroed in on the
plan itself" is disingenuous. Trial Tr. 115. Sorenson did not
"zoom in" on the floor plans; he cut, moved, and pasted the

title block and construction legend, and he deleted the copyright notice and the author block.  Finally, the notion that the Copyright Office would not be interested in the fact that an architect had claimed a copyright in the plans being submitted by Sorenson—who had no architectural experience—is absurd.

54. The plaintiff also submitted "Form VA" to the Copyright office.  This form applies to "published or unpublished works of the visual arts.  This category consists of 'pictorial graphic, or sculptural works,' including two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes charts, technical drawings, diagrams, and models."

55. In the first space on the form, Sorenson identified the title of the work as "Sorenson Residence (not yet fully constructed)."  Def.'s Ex. 43A.  The instructions to the form provide: "For an architectural work that has been constructed, add the date of the construction after the title; if unconstructed at this time, add 'not yet constructed.'"  Id.

56. In the second space on the form, Sorenson identified only himself as an author.  Id.  The instructions to the form provide: "unless the work is a 'collective work,' give the requested information about every 'author' who contributed any appreciable amount of copyrightable matter to this version of the work."  Id.

57. Also in the second space on the form, Sorenson checked the box for "Architectural Work."  The instructions to the form provide: "NOTE: Any registration for the underlying architectural plans must be applied for on a separate Form VA, checking the box 'Technical drawing'."  Id.  The instructions define technical drawings as "diagrams illustrating scientific or technical information in linear form, such as architectural blueprints or mechanical drawings," and architectural works as "designs of buildings, including the overall form as well as the arrangement and composition of spaces and elements of the design."  Id.

58. In the third space on the form, Sorenson listed 2005 as the "year in which creation of this work was completed."  Id. The instructions to the form provide: "The date you give here should be the year in which the author completed the particular version for which registration is now being sought, even if other versions exist or if further changes or additions are planned."  Id.

59. In the fourth space on the form, Sorenson represented that he was the sole copyright claimant.  The instructions to the form provide: "The copyright claimant is either the author of the work or a person or organization to whom the copyright initially belonging to the author has been transferred."  Id. Those instructions also provide that "if the copyright claimant

20

is not the author, the application for registration must contain 'a brief statement of how the claimant obtained ownership of the copyright.'  If any copyright claimant named in space 4 is not an author named in space 2, give a brief statement explaining how the claimant(s) obtained ownership of the copyright." Id.

60. In the fifth space on the form, Sorenson stated that no one had previously registered the floorplan and the roofplan. Id.

61. In the sixth space on the form, Sorenson represented that the plans were not "based on" "any preexisting work." Id. The instructions to the form provide, "[c]omplete space 6 if this work is a 'changed version,' 'compilation,' or 'derivative work,' and if it incorporates one or more earlier works that have already been published or registered for copyright. . . . A 'derivative work' is 'a work based on one or more preexisting works.'" Id.  The instructions further provide that the registrant must identify "preexisting work that has been recast, transformed or adapted," and a "general statement of the additional new material covered by the copyright claim for which registration is sought." Id.

62. Sorenson received a certificate of registration from the Copyright Office on January 28, 2008.  Pl.'s Ex. 2.

63. On February 19, 2008, the Appellate Division, First Department, preliminarily enjoined Bridge Capital and Wolfson

from selling Unit 7A pending the appeal in the contract action.
Def.'s Ex. 41.

64. By order dated April 7, 2008, Justice Ramos granted the
motion for summary judgment by 257 Realty, Bridge Capital, and
Wolfson in the fraudulent conveyance action.  The court
dismissed Sorenson's complaint, canceled the notice of pendency
on the Building, sanctioned Sorenson and his then-counsel, and
awarded attorneys' fees and costs to the defendants.  Def.'s Ex.
37.

65. On June 10, 2008, the Appellate Division, First
Department, affirmed the dismissal of Sorenson's complaint in
the contract action, except with respect to Sorenson's claim for
specific performance for breach of the covenant of good faith
and fair dealing.  Sorenson v. Bridge Capital Corp., 861
N.Y.S.2d 280, 282-83 (App. Div. 2008).  The court also continued
to enjoin the sale of Unit 7A "for 20 days from the date of
service of the order on this appeal with notice of entry."  Id.
at 281.

66. On December 23, 2008, the Appellate Division issued an
order stating that the injunction in the contract action had
expired on August 3, 2008.  Def.'s Ex. 41.

67. In February 2009, 257 Realty sold Unit 7A—as a two
bedroom apartment—to an unrelated third party.  Pl.'s Ex. 47;
Def.'s Ex. 84.

68. On May 28, 2009, the Appellate Division affirmed Justice Ramos's judgment dismissing the fraudulent conveyance action. Sorenson v. 257/117 Realty, LLC, 881 N.Y.S.2d 43 (App. Div. 2009).  The court reasoned that "there was no showing of fraud or intent to defraud because the parties to the conveyance had taken steps to ensure that any potential judgment would be satisfied."  Id. at 44.

69. On July 6, 2009, Sorenson moved in the Appellate Division to "renew or reargue" the dismissal of the fraudulent conveyance action.  Def.'s Ex. 60.  Sorenson argued that the defendants misrepresented to the court that they "had taken steps to ensure that any judgment in favor Plaintiff on his underlying specific-performance claim to enforce agreements to purchase three condo units from Defendants . . . would be satisfied."  Id.

70. On October 1, 2009, the Appellate Division denied the motion.  Def.'s Ex. 59.  The order stated: "Now, upon reading and filing the papers with respect to the motion, and due deliberation have been had thereon, [i]t is ordered that the motion is denied."  Id.[7]

---

[7]    On January 19, 2010, Chief Judge Lippman denied Sorenson's motion for leave to appeal to the Court of Appeals the dismissal of the fraudulent conveyance action.  Def.'s Ex. 112.

71. On June 2, 2010, Sorenson filed an order to show cause in the New York State Supreme Court, requesting that the court grant a motion to renew or to vacate the order of dismissal in the fraudulent conveyance action, reinstate the complaint, and grant Sorenson leave to file a notice of pendency.  Def.'s Ex. 62.

72. That same day, Justice Ramos denied the motion.  Def.'s Ex. 63.

73. On June 11, 2010, Sorenson filed the original complaint in this action against Stanley Wolfson, Robert Friedman, Bernard Friedman, Penmark Realty, and 257 Realty.  The complaint alleged claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*, the Copyright Act, 17 U.S.C. § 501 *et seq.*, section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), New York's deceptive trade practices law, N.Y. Gen. Bus. Law § 349, and common law unfair competition.

74. The plaintiff then amended the complaint.  This Court dismissed or found withdrawn the plaintiff's RICO claims, fraudulent conveyance claim, deceptive trade practices claim, and unfair competition claim.  With the Court's leave, the plaintiff then filed a second amended complaint.

75. Robert Friedman, Bernard Friedman, Penmark Realty, and 257 Realty were voluntarily dismissed from this action.

76. Wolfson then moved for summary judgment, and the Court denied the motion.

77. In the joint pretrial order, the plaintiff identified three remaining claims to be tried: (1) copyright infringement of the Unit 7A floor plans, (2) "fraud in the termination of the January 2005 agreements between Plaintiff and Bridge Capital Corp. for the sale to Plaintiff of Units 7A, 7D, and 6B," and (3) "fraudulent misrepresentation to procure a money judgment against Plaintiff in the 2006 case by Plaintiff against Wolfson et al. alleging fraudulent conveyance of the Building."

78. On the second day of the trial, the plaintiff withdrew his fraudulent termination claim, leaving only the copyright infringement claim and his claim for alleged fraudulent procurement of a money judgment in the fraudulent conveyance action.  Trial Tr. 197.

79. For medical reasons, Ernst was not available to testify. Neither party deposed Ernst before trial.

### CONCLUSIONS OF LAW

1. To the extent any of the foregoing findings of fact is a conclusion of law, it is hereby adopted as a conclusion of law, and vice versa.

2. The Court has subject matter jurisdiction over the Copyright Act claim pursuant to 28 U.S.C. §§ 1331 and 1338(a).

### Copyright Act Claim

3. "In order to make out a claim of copyright infringement for an architectural work—or any work—a plaintiff must establish three things: 1) that his work is protected by a valid copyright, 2) that the defendant copied his work, and 3) that the copying was wrongful." Zalewski v. Cicero Builder Dev., Inc., 754 F.3d 95, 100 (2d Cir. 2014).

4. The plaintiff registered the Unit 7A plans as architectural works.  Section 102(a)(8) of title 17 of the United States Code provides that works of authorship include architectural works.  An "architectural work" is "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings."  17 U.S.C. § 101.

5. Under 17 U.S.C § 410(c), a "certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." See also Langman Fabrics v. Graff Californiawear, Inc., 160 F.3d 106, 111 (2d Cir. 1998).  Because the defendant does not dispute that Sorenson received a certificate of registration within five years of the first publication of the work, the defendant bears the burden of demonstrating that the floorplan and roofplan are not copyrightable.

6. "However, 'a certificate of registration creates no irrebuttable presumption of copyright validity.'" <u>Carol Barnhart Inc. v. Econ. Cover Corp.</u>, 773 F.2d 411, 414 (2d Cir. 1985) (quoting <u>Durham Indus., Inc. v. Tomy Corp.</u>, 630 F.2d 905, 908 (2d Cir. 1980)).  And the burden to prove infringement remains with the plaintiff.  <u>See</u> <u>Petrella v. Metro-Goldwyn-Mayer, Inc.</u>, 134 S. Ct. 1962, 1976 (2014).

**A.**

7. Wolfson disputes that Sorenson is the "owner" of a valid copyright.  "The Copyright Act of 1976 provides that copyright ownership 'vests initially in the author or authors of the work.' 17 U.S.C. § 201(a).  As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." <u>Cmty. for Creative Non-Violence v. Reid</u>, 490 U.S. 730, 737 (1989); <u>see also</u> <u>Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.</u>, 363 F.3d 177, 185 (2d Cir. 2004).  "[A]uthorship is a *sine qua non* for any claim of copyright . . . .  That is, the person claiming copyright must either himself be the author, or he must have succeeded to the rights of the author."  1 Melville B. Nimmer & David Nimmer, <u>Nimmer on Copyright</u> § 5.01[A] (1993).

8. The Copyright Act defines a work as "fixed" in a tangible medium of expression when "its embodiment in a copy . . . *by or*

*under the authority of the author*, is sufficiently permanent . .
. to permit it to be . . . reproduced." 17 U.S.C. § 101
(emphasis added). Thus, "both tangibility and originality are
necessary aspects of authorship. A person is not an author if
he has an original idea that is not expressed in tangible form,
and a person is not an author if he expresses another's idea in
tangible form without any original contribution." Medforms,
Inc. v. Healthcare Mgmt. Solutions, Inc., 290 F.3d 98, 107-08
(2d Cir. 2002).

9. Sorenson did not translate any idea into a fixed,
tangible expression entitled to copyright protection. It is
undisputed that from 2004 to 2007, Sorenson hired Ernst—a
registered architect—to create floorplans and roofplans for Unit
7A. Sorenson testified that he could not create a set of
blueprints with the AutoCAD software. Nor does he have an
understanding of New York City building code requirements or
simple construction concepts. And the floorplan and the
roofplan that Sorenson registered with the Copyright Office are
copies of plans that Ernst created with the AutoCAD software.
The only "difference" between those two sets of plans is that
Sorenson conspicuously deleted Ernst's author block, the
copyright symbol, and the drafting history.

10. Sorenson testified at trial that he provided Ernst with
"detailed instructions" and "sketches" for Unit 7A, but this

testimony was not credible.  Sorenson was not sure when he
provided those instructions and sketches.  He selectively
deleted Ernst's name and copyright notice when he submitted the
plans to the Copyright Office, but nonetheless testified that
"there was no attempt to pretend like this was not Todd Ernst's
AutoCAD file."

11. Whatever "instructions" or "sketches" Sorenson gave to
Ernst—if any—did not make Sorenson the "author" of the plans
submitted to the Copyright Office.

12. It is true that a scrivener who simply transcribes
another's work does not become an author of the work.  But
architect Todd Ernst was no mere scrivener.  In <u>Medforms</u>, the
Second Circuit Court of Appeals held that a computer programmer
was not an "author" of a program, because he was told "what to
do and how to do it and what kind of encryption to use, how to
encrypt the files step-by-step exactly what had to be done."
290 F.3d at 108.  <u>Medforms</u> also cited with approval the
statutory definition of "by or under the authority of the
author" from <u>Andrien v. South Ocean County Chamber of Commerce</u>,
927 F.2d 132 (3d Cir. 1991).  In that case, the Court of Appeals
for the Third Circuit contrasted "mechanical transcription" with
"high technical enhancement":

> The critical phrase is "by or under the authority of the
> author."  That statutory language and the Supreme
> Court's guidance produce a definition of an author as

> the party who actually creates the work, that is, the
> person who translates an idea into an expression that is
> embodied in a copy by himself or herself, or who
> authorizes another to embody the expression in a copy.
> The definition, however, has limits. When one
> authorizes embodiment, that process must be rote or
> mechanical transcription that does not require
> intellectual modification or highly technical
> enhancement such as occurred in M.G.B. Homes, Inc. v.
> Ameron Homes, Inc., 903 F.2d 1486 (11th Cir. 1990)
> (architectural drawings) . . . .

Adrien, 927 F.2d at 134-35.

13. Indeed, courts have uniformly held that absent unusual circumstances, if a homeowner who lacks architectural training provides "sketches," "instructions," or "input" to a professional architect, then the architect—not the homeowner—is the author of the resulting blueprints. See, e.g., Ameron Homes, 903 F.2d at 1492-93; Fairview Dev. Corp. v. Aztex Custom Homebuilders, LLC, No. 07cv0337, 2009 WL 529899, at *5 (D. Ariz. Mar. 3, 2009); Watkins v. Chesapeake Custom Homes, L.L.C., 330 F. Supp. 2d 563, 571-73 (D. Md. 2004); Wood v. B L Bldg. Co., No. 03cv713, 2004 WL 5866352, at *12 (S.D. Tex. June 22, 2004); Zitz v. Pereira, 119 F. Supp. 2d 133, 144-46 (E.D.N.Y. 1999), aff'd, 225 F.3d 646 (2d Cir. 2000) (unpublished disposition); Fred Riley Home Bldg. Corp. v. Cosgrove, 864 F. Supp. 1034, 1037, 1039-40 (D. Kan. 1994); Aitken, Hazen, Hoffman, Miller, P.C. v. Empire Constr. Co., 542 F. Supp. 252, 259 (D. Neb. 1982); Meltzer v. Zoller, 520 F. Supp. 847, 856-57 (D.N.J. 1981).

14. Sorenson insists that he provided Ernst with instructions and sketches concerning the layout of Unit 7A. And Ernst then used his training and skills to create the detailed floorplan and roofplan of Unit 7A. Therefore, Ernst—not Sorenson—is the author of the Unit 7A plans.

15. Sorenson has not argued that he and Ernst are joint authors of the plans, perhaps because Sorenson never attested to the Copyright Office that Ernst was an author and that Sorenson was a "joint author." Moreover, the words "joint author" do not appear in the trial transcript, the joint pretrial order, or the plaintiff's proposed findings of facts and law. In any event, the plaintiff introduced no evidence suggesting that he was a "joint author" for the plans. First, as explained above, Sorenson did not provide an independently copyrightable contribution to the plans. See Childress v. Taylor, 945 F.2d 500, 507 (2d Cir. 1991). Second, there is no evidence that Ernst and Sorenson intended to be joint authors. Id. at 507–08. Indeed, the contract between Ernst and Sorenson, which Sorenson acknowledges governed their relationship, provided that Ernst's firm would own the plans. The contract states: "All drawings and specifications prepared by our office shall remain our

exclusive property at all time for the purpose of reproduction."

Def.'s Ex. 110.[8]

**B.**

16. Moreover, because Sorenson committed fraud on the Copyright Office, he also does not have a valid copyright capable of enforcement.  See Whimsicality, Inc. v. Rubie's Costume Co., 891 F.2d 452, 456 (2d Cir. 1989).

17. "Only the 'knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitute[s] reason for holding the registration invalid and thus incapable of supporting an infringement action . . . or denying enforcement on the ground of unclean hands." Eckes v. Card Prices Update, 736 F.2d 859, 861-62 (2d Cir. 1984) (alteration and omission in original) (quoting Russ Berrie &

---

[8]   Sorenson did not argue that the plans were a "work made for hire," and Sorenson did not attest to the Copyright Office that the plans were a "work made for hire."  A work made for hire must either be "prepared by an employee within the scope of his or her employment," or, for certain items, "the parties [must] expressly agree in a written instrument signed by them that the work shall be considered a work made for hire."  17 U.S.C. § 101; see also 17 U.S.C. § 201(b); Ameron Homes, 903 F.2d at 1492.  Ernst was not Sorenson's employee, and the parties did not agree that the plans would be a work made for hire.  The plaintiff also provided no evidence suggesting that Ernst transferred ownership of the copyright.  See 17 U.S.C. § 204(a) ("A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.").

Co., Inc. v. Jerry Elsner Co., 482 F. Supp. 980, 988 (S.D.N.Y. 1980)).

18. Sorenson plainly misrepresented material facts to the Copyright Office.  In the second space on his Form VA, Sorenson identified only himself as an author of the work.  The instructions to the form required Sorenson to "give the requested information about every 'author' who contributed any appreciable amount of copyrightable matter to this version of the work."  Def.'s Ex. 43A.  And in the third space on the form, Sorenson represented that he was the sole copyright claimant. The instructions to that portion of the form provide: "The copyright claimant is either the author of the work or a person or organization to whom the copyright initially belonging to the author has been transferred."  Id.

19. Both answers were false.  The instructions required Sorenson to list "every 'author' who contributed *any* appreciable amount of copyrightable matter," and Sorenson failed to identify Ernst as an author.  Id.

20. These omissions were not "inadvertent and unintentional."  Lida, Inc. v. Texollini, Inc., 768 F. Supp. 439, 442 (S.D.N.Y. 1991).  Sorenson removed any reference to Ernst, including Ernst's copyright notice, from the plans that he submitted.  As explained above, Sorenson's explanation for these omissions was incredible.

21. The misrepresentations were also material.
"[A]uthorship is a *sine qua non* for any claim of copyright . . .
."  Nimmer & Nimmer, <u>supra</u>, § 5.01[A].  Had the Copyright Office
known that Ernst prepared and created the plans—and that Ernst
had not transferred ownership to Ernst—the Copyright Office
would not have granted Sorenson a copyright registration.

22. In his summation, Sorenson argued that Wolfson had
failed to plead fraud on the Copyright Office in the answer.
However, Wolfson identified this defense in the joint pretrial
order.  <u>See</u> Joint Pretrial Order at 2 ("Wolfson overcomes the
validity of Sorenson's copyright due to his fraud on the
Copyright Office in [h]is Application for Copyright Registration
. . . .").  Sorenson did not object when the joint pretrial
order was filed.  Although the "general rule in federal courts
is that a failure to plead an affirmative defense results in a
waiver," <u>Travellers Int'l, A.G. v. Trans World Airlines, Inc.</u>,
41 F.3d 1570, 1580 (2d Cir. 1994), a defendant may raise "an
affirmative defense for the first time in the joint PTO."
<u>Gilmore v. Gilmore</u>, 503 F. App'x 97, 99 (2d Cir. 2012) (summary
order); <u>see also</u> <u>Giles v. Gen. Elec. Co.</u>, 245 F.3d 474, 491–92
(5th Cir. 2001).

34

C.

23. Sorenson's claim for copyright infringement also fails because he did not prove that anyone engaged in unauthorized copying of the plans.

24. Sorenson appears to allege that Wolfson violated the copyright in the Unit 7A plans by (i) including the floorplan in the third amendment to the offering plan and the roofplan in the fifth amendment to the offering plan, (ii) posting a rough sketch of the plans on the Halstead Property website, and (iii) building Unit 7A according to the four-bedroom plan.

i.

25. Including the floorplan and the roofplan in the amendments to the offering plan and building Unit 7A according to those plans were not acts of infringement.  Sorenson provided the plans to the builder and sought to have the plans used to construct Unit 7A as part of the settlement of the state court litigation.  It is absurd for Sorenson to sue for copyright infringement based on the actions that he solicited.

26. Although courts have adopted various tests to determine whether a copyright holder authorized another to copy a work, "the question comes down to whether there was a 'meeting of the minds' between the parties to permit the particular usage at issue." Psihoyos v. Pearson Educ., Inc., 855 F. Supp. 2d 103, 120-24 (S.D.N.Y. 2012); see also John G. Danielson, Inc. v.

35

<u>Winchester-Conant Props., Inc.</u>, 322 F.3d 26, 40 (1st Cir. 2003)
("The touchstone for finding an implied license, according to
this framework, is intent.").

27. During the settlement negotiations, Sorenson requested
that 257 Realty update the offering plan and build Unit 7A
according to the four-bedroom floorplan and roofplan.  And 257
Realty followed the plaintiff's instructions.  Therefore, there
was a meeting of the minds to permit 257 Realty (a) to include
the plans in the amendments to the offering plan and (b) to
build Unit 7A according to Sorenson's specifications.  In fact,
257 Realty rebuilt Unit 7A with two-bedrooms after the
settlement negotiations failed.

**ii.**

28. Wolfson also cannot be held liable for the fact that the
plans were posted on the Halstead Property website.  Posting
those plans was not copyright infringement.

29. Section 120(a) of title 17 of the United States Code
provides that "[t]he copyright in an architectural work *that has
been constructed* does not include the right to prevent the
making, distributing, or public display of pictures, paintings,
photographs, or other pictorial representations of the work, if
the *building in which the work* is embodied *is located in* or
ordinarily visible from a public place." (emphasis added).
Therefore, creating a "pictorial representation" of a

36

constructed work that is located in a building visible from a
public place is not an act of infringement.

30. While the Second Circuit Court of Appeals has not
defined the term "constructed" in § 120(a), it has explained the
meaning of the phrase "constructed" in 37 C.F.R. § 202.11(d)(3),
which "prescribes rules pertaining to the registration of
architectural works." The Court of Appeals explained the term
"constructed" should mean "substantially constructed":

> First, we think that, with respect to buildings and
> houses, "finished" is a term that is hopelessly vague.
> It is said that the Cathedral of Milan, started hundreds
> of years ago, is not yet quite finished. And anyone who
> has built a house knows that the same is all too
> frequently true even with respect to private residences.
> While "substantially constructed" is not itself
> perfectly clear, we think it is a more practical
> definition.
> In addition, and more important, the C.F.R.
> excludes those architectural works that were
> "constructed or otherwise published" from the
> protections of the AWCPA. 37 C.F.R. § 202.11(d)(3)
> (emphasis added). If we are to understand "constructed"
> as having the same significance as "publication" for
> purposes of copyright protection, then it seems more
> sensible to say that the equivalent of publication
> occurs when others can readily see—and copy—the work in
> question.  On that basis, habitability and final
> completion seem much less significant, and whether the
> architectural work is substantially constructed is much
> closer to what Congress intended in the statute.

Richard J. Zitz, Inc. v. Dos Santos Pereira, 232 F.3d 290, 292–
93 (2d Cir. 2000).

31. The Court of Appeal's definition of "constructed" in
§ 202.11(d)(3) should also apply to the definition of

"constructed" in § 120(a).  It is reasonable to construe the word "constructed" similarly in the two provisions relating to copyright protection for architectural works.

32. There was a pictorial representation of Unit 7A on the Halstead Property's website on November 26, 2007.  This pictorial depiction was not a direct copy of the plans for which Sorenson received a copyright registration.  Compare Pl.'s Ex. 1, with Pl.'s Ex. 12.

33. When Halstead Property posted a sketch of the plans on its website, Unit 7A was substantially constructed and located in a building that was visible from a public place (the street). Michael Even, who replaced Ernst as the chief architect for the Building, credibly testified that Unit 7A was substantially constructed by November 12, 2007.  Trial Tr. 415.

34. Therefore, because Unit 7A was substantially constructed in a building that was visible from a public place on November 26, 2007, the pictorial representation did not infringe on the alleged copyright.  See Morgan v. Hawthorne Homes, Inc., No. 04cv1809, 2009 WL 1010476, at *12 (W.D. Pa. Apr. 14, 2009).

**D.**

35. The plaintiff also did not prove that Wolfson—directly or indirectly—infringed any copyright for the plans of Unit 7A.

**i.**

36. Sorenson provided no evidence that Wolfson directly infringed on any copyright for the Unit 7A plans.  Direct liability requires a "nexus sufficiently close and causal to the illegal [infringement] that one could conclude that the [defendant] himself trespassed on the exclusive domain of the copyright owner."  <u>Cartoon Network LP, LLLP v. CSC Holdings, Inc.</u>, 536 F.3d 121, 130 (2d Cir. 2008) (internal quotation marks omitted) (quoting <u>CoStar Group, Inc. v. LoopNet, Inc.</u>, 373 F.3d 544, 550 (4th Cir. 2004)).  Sorenson failed to prove that Wolfson was responsible for the three alleged infringements.  <u>See</u> Conclusion of Law ¶ 24, supra.

37. Robert Friedman testified credibly that he and his brother made all decisions regarding (1) what information was included in the offering plans, (2) the directions given to Halstead Property for advertising Unit 7A, and (3) the construction of that unit.  Trial Tr. 299.  And Wolfson similarly testified that Robert and Bernard Friedman made all management decisions for 257 Realty.  Trial Tr. 336.

38. Accordingly, there is no evidence that Wolfson directly caused any of the three alleged copyright infringements.

**ii.**

39. Nor has Sorenson proved that Wolfson is vicariously liable for copyright infringement.[9]

40. For Wolfson to be vicariously liable, Sorenson must prove that Wolfson "profit[ed] from direct infringement while declining to exercise a right to stop or limit it." Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005). "Thus, vicarious liability is premised wholly on direct financial benefit and the right and ability to control infringement; it does not include an element of knowledge or intent on the part of the vicarious infringer." Arista Records LLC v. Usenet.com, Inc., 633 F. Supp. 2d 124, 156 (S.D.N.Y. 2009).

41. There is no evidence that Wolfson had the right and the ability to control the alleged infringing activity.  The Operating Agreement provides that the operation and control of 257 Realty "shall be vested solely in the Managers.  The Managers of the company shall be [Robert Friedman] and [Bernard Friedman]."  Def.'s Ex. 26, at ¶ 3.1.  The Operating Agreement also states that "[a]ny decision regarding the construction,

---

[9]    This discussion is for purposes of completeness.  Sorenson has not attempted to explain whether he contends that Wolfson is liable for direct copyright infringement or on the basis of some form of secondary liability.  In any event, there is no merit to any such theory.

financing, budgeting and marketing of the project shall be made by the unanimous concurrence of all Managers, without the requirement of consent by the Members." Id. As a member, Wolfson lacked the authority to stop 257 Realty from copying or using the Unit 7A plans.

42. Robert Friedman and Wolfson both testified credibly that the Friedmans, and not Wolfson, managed the Building. Trial Tr. 299.

43. The only other "evidence" of control offered by Sorenson is Wolfson's signature on the second amendment to the offering plan. Although Wolfson signed this amendment on behalf of Bridge Capital, that does not show that Wolfson had any involvement in the alleged infringements. He signed the offering plan because ownership of the Building could have reverted back to Bridge Capital had Sorenson prevailed in the fraudulent conveyance action. And there is no evidence linking this "sponsorship" to control.

**iii.**

44. Sorenson also did not prove that Wolfson is liable for contributory infringement.

45. Contributory infringement liability is based upon the defendant's relationship to the direct infringement: "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may

41

be held liable as a 'contributory' infringer." <u>Gershwin Publ'g</u>
<u>Corp. v. Columbia Artists Mgmt., Inc.</u>, 443 F.2d 1159, 1162 (2d
Cir. 1971).  For contributory infringement, constructive
knowledge of the direct infringement is sufficient.  <u>Ez-Tixz,</u>
<u>Inc. v. Hit-Tix, Inc.</u>, 919 F. Supp. 728, 732 (S.D.N.Y. 1996).

46. There is no evidence that Wolfson induced, caused, or
materially contributed to the infringing activity.  According to
Sorenson, the infringing distribution of the plans occurred
through (1) the distribution of the offering plans, (2) the
posting on the Halstead Property's website, and (3) the
construction of Unit 7A.  As explained above, Robert and Bernard
Friedman—as managers of 257 Realty—were responsible each of
these actions.  Wolfson was an investor rather than a manager.

47. Therefore, the plaintiff's claim for copyright
infringement is **dismissed.**

## Fraud Claim

### A.

48. The Court lacks subject matter jurisdiction to decide
the plaintiff's "fraudulent misrepresentations to procure a
money judgment" claim.

49. The <u>Rooker</u>-<u>Feldman</u> doctrine provides that "federal
district courts lack jurisdiction over suits that are, in
substance, appeals from state-court judgments."  <u>See</u> <u>Hoblock v.</u>
<u>Albany Cnty. Bd. Of Elections</u>, 422 F.3d 77, 84 (2d Cir. 2005);

see also <u>Exxon Mobil Corp. v. Saudi Basic Indus. Corp.</u>, 544 U.S.
280, 291 (2005).

50. There are four "requirements" that must be met before
the <u>Rooker</u>–<u>Feldman</u> doctrine applies:

> First, the federal-court plaintiff must have lost in
> state court. Second, the plaintiff must "complain[ ] of
> injuries caused by [a] state-court judgment[.]"  Third,
> the plaintiff must "invit[e] district court review and
> rejection of [that] judgment[ ]."  Fourth, the state-
> court judgment must have been "rendered before the
> district court proceedings commenced"—i.e., <u>Rooker</u>-
> <u>Feldman</u> has no application to federal-court suits
> proceeding in parallel with ongoing state-court
> litigation. The first and fourth of these requirements
> may be loosely termed procedural; the second and third
> may be termed substantive.

<u>Hoblock</u>, 422 F.3d at 85 (alternations in original) (quoting <u>Saudi</u>
<u>Basic Indus.</u>, 544 U.S. at 283–84).

51. Sorenson lost in state court, and the state courts
entered judgments before the proceedings in this Court
commenced.  The Appellate Division affirmed the dismissal of his
fraudulent conveyance claim and affirmed the imposition of
sanctions and the award of costs and fees.  Sorenson then moved
to reargue or reopen, alleging that Wolfson defrauded the
Appellate Division.  The Appellate Division denied the motion,
and in 2009, Chief Judge Lippman denied leave to appeal to the
Court of Appeals.  Sorenson then asked for similar relief from
Justice Ramos, who also denied the motion in June 2010.

Sorenson finally filed this action in July 2010 after he was unsuccessful in state court.

52. Sorenson is complaining about an injury "caused by" a state court judgment.  His claim is styled "fraudulent misrepresentations to procure a money judgment from Plaintiff in the 2006 case by Plaintiff against Wolfson et al. alleging fraudulent conveyance of the Building."  Joint Pretrial Order at 2.  The injury alleged by Sorenson—the affirmance of an award of sanctions, costs, and attorneys' fees—was an award imposed by a state court.

53. Sorenson now asks this Court to review and reject the judgments of the New York State courts that imposed those costs on him.  The monetary damages that Sorenson alleges here are those imposed on Sorenson by the state courts.  In order to award Sorenson the requested damages, this Court would be required to conclude that the state courts should not have imposed those sanctions on Sorenson.  That would require this Court to reverse a state court judgment, precisely what the Rooker-Feldman doctrine prohibits.

54. Vossbrinck v. Accredited Home Lenders, Inc., 773 F.3d 423, 427–28 & n.1 (2d Cir. 2014) (per curiam), is not to the contrary.  There, after losing title to their property in a state foreclosure action, the federal-court plaintiffs brought suit against their mortgage providers.  The claims of the

Vossbrink plaintiffs did not challenge the state court's foreclosure judgment and were thus not barred by the Rooker-Feldman doctrine.  Id. at 426.

55. Sorenson asks this Court to have Wolfson disgorge the monetary award that Wolfson received from Sorenson in the state court action.  This is not a case in which a plaintiff "seeks damages for injuries suffered as a result of defendants' alleged fraud and does not attempt to reverse or undo a state court judgment."  Babb v. Capitalsource, Inc., No. 14cv712, 2015 WL 64360, at *1 (2d Cir. Jan. 6, 2015) (unpublished disposition). Rather, Justice Ramos imposed sanctions and awarded costs and fees—that monetary award was a "judgment" of the state courts— and the Appellate Division affirmed.  Sorenson moved for reconsideration on the basis of the *exact* fraudulent conduct alleged here, which the Appellate Division and Justice Ramos denied.  To award Sorenson damages would require this Court, in effect, to sit as an appellate court, review the propriety of the state court judgments awarding fees and denying reconsideration, and have Wolfson disgorge the monetary award that he received in state court.  In short, Sorenson is asking this Court to give him his money back.

56. That Sorenson alleges "fraud on the state court" does not change the result.  Courts in this District consistently have held that there is no "fraudulent procurement" exception to

the <u>Rooker</u>-<u>Feldman</u> doctrine.  <u>See, e.g.</u>, <u>Lajaunie v. Samuels &</u>
<u>Son Seafood Co.</u>, No. 14cv2793, --- F. Supp. 3d. ---, 2014 WL
7190922, at *5-6 (S.D.N.Y. Dec. 12, 2014) (collecting cases).

57. Moreover, any "fraudulent procurement" exception would
not apply where, as here, the argument was presented to the
state court and rejected.  <u>See Reusser v. Wachovia Bank, N.A.</u>,
525 F.3d 855, 859-60 (9th Cir. 2008).  A state court judgment
cannot reasonably be fraudulently procure when the very grounds
for the alleged fraud were raised by a motion to reconsider in a
state court and rejected.

58. Accordingly, Sorenson's "fraudulent procurement" claim
is dismissed for lack of subject matter jurisdiction.

**B.**

59. For the purpose of completeness, the Court also notes
that Sorenson's fraud claim fails on the merits.[10]

---

[10]    It is doubtful that there is an independent state law cause
of action against Wolfson for "fraudulently procuring" a
judgment in state court.  Section 487 of the New York Judiciary
Law, which provides a cause of action against an attorney who
"is guilty of any deceit or collusion, or consents to any deceit
or collusion, with intent to deceive the court or any party,"
does not apply to Wolfson (a non-attorney).  And when a
plaintiff alleges that a non-attorney defrauded a New York state
court in a prior proceeding, the "remedy lies exclusively in
that lawsuit itself, i.e., by moving pursuant to CPLR 5015 to
vacate the civil judgment due to its fraudulent procurement, not
a second plenary action collaterally attacking the judgment in
the original action."  <u>Yalkowsky v. Century Apartments Assocs.</u>,
626 N.Y.S.2d 181, 182-83 (App. Div. 1995).

60. A claim of fraud under New York law consists of the following elements: (1) a misrepresentation or concealment of a material fact, (2) falsity, (3) scienter on the part of the wrongdoer, (4) justifiable reliance, and (5) resulting injury. Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc., 980 N.Y.S.2d 21, 27 (App. Div. 2014).

61. Here, the damages identified by Sorenson were the imposition of sanctions and the award of fees and costs. Sorenson alleges that Wolfson caused those damages by lying to the Appellate Division.  But Sorenson moved to renew or reargue, and the Appellate Division denied the motion.  And Justice Ramos later did the same.  Therefore, Wolfson's alleged false statement did not result in Sorenson's injury—the New York courts continued to impose sanctions *after* considering Sorenson's fraud allegation.  See Laub v. Faessel, 745 N.Y.S.2d 534, 536 (2002) ("[P]laintiff must establish that the alleged misrepresentations or other misconduct were the direct and proximate cause of the losses claimed.").[11]  Therefore, Wolfson did not cause Sorenson's alleged injury.

---

[11]   Moreover, the claim is likely barred by collateral estoppel.  New York law bars relitigation of an issue of law or fact if: "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding."  Colon v. Coughlin, 58 F.3d 865, 869 (2d Cir. 1995) (citations omitted).  Sorenson raised his fraud claim to the Appellate Division and to Justice

**CONCLUSION**

The foregoing constitutes the Court's findings of fact and conclusions of law.  The Court has considered all of the arguments of the parties.  To the extent not specifically discussed above, any remaining arguments are either moot or without merit.  For the reasons explained above, all of the plaintiff's claims are **dismissed with prejudice**.  The Clerk is directed to enter judgment, to close all pending motions, and to close this case.

**SO ORDERED.**

Dated:     New York, New York
           March 30, 2015            _____/s/_____
                                           John G. Koeltl
                                     United States District Judge

---

Ramos, and he had a full opportunity to brief the question. Both courts denied the motion.  New York state courts have collaterally estopped a party form litigating an issue previously raised in a motion for reconsideration.  See 3 E. 54 St. N.Y., LLC v. Patriarch Partners Agency Servs. LLC, 972 N.Y.S.2d 549, 449–50 (App. Div. 2013).